## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

AIRKO INC., et al.,

                **Plaintiffs,**

    **-vs-**

GENERAL MOTORS LLC,

                **Defendant.**

**CASE NO. 1:20-CV-02638**

**JUDGE PAMELA A. BARKER**

**MEMORANDUM OF OPINION AND ORDER**

This matter comes before the Court upon the Motion to Dismiss Class Action Complaint ("Motion to Dismiss") of Defendant General Motors LLC ("GM").  (Doc. Nos. 10, 11.)  Plaintiffs Airko, Inc. ("Airko") and Lisa Mae Jennings ("Jennings") (collectively, "Plaintiffs") filed a brief in opposition to GM's Motion to Dismiss on March 1, 2021, to which GM replied on March 15, 2021. (Doc. Nos. 15, 16.)  On May 14, 2021, Plaintiffs also filed a Notice of Supplemental Authority, to which GM replied on May 17, 2021.  (Doc. Nos. 21, 22.)  For the following reasons, GM's Motion to Dismiss (Doc. Nos. 10, 11) is GRANTED IN PART and DENIED IN PART.

### I.  Background

#### a.  Factual Allegations

##### i.  The Oil Consumption Defect

In 2006, for its model year 2007 vehicles, General Motors Corporation ("GMC") introduced its redesigned Generation IV 5.3 Liter V8 Vortec 5300 LC9 Engine (the "Generation IV Vortec 5300 Engine") and installed it in many of its most popular vehicles—specifically, the Chevrolet Avalanche, Chevrolet Silverado, Chevrolet Suburban, Chevrolet Tahoe, GMC Sierra, GMC Yukon, and GMC Yukon XL.  (Doc. No. 1 at ¶¶ 2, 4.)  GMC continued selling vehicles equipped with the Generation

IV Vortec 5300 Engines through 2009.  (*Id.* at ¶ 48.)  However, on June 8, 2009, GMC filed for protection under Chapter 11 of the United States Bankruptcy Code.  (*Id.* at ¶ 49.)  GM then acquired the assets of GMC and emerged from bankruptcy on July 10, 2009.  (*Id.* at ¶ 50.)  For model years 2010 to 2014, GM continued manufacturing and selling vehicles under the Chevrolet and GMC brands equipped with the Generation IV Vortec 5300 Engines.  (*Id.* at ¶¶ 6, 50-51.)

According to Plaintiffs, the Generation IV Vortec 5300 Engine consumes an improperly high quantity of oil that far exceeds industry standards for reasonable oil consumption.  (*Id.* at ¶ 5.)  Multiple factors contribute to this oil consumption defect.  (*Id.* at ¶ 7.)  First, the piston rings in the Generation IV Vortec 5300 Engines fail to keep oil in the crankcase and out of the combustion chamber.  (*Id.* at ¶¶ 8, 56, 60.)  Second, the oil pressure relief valve in the Active Fuel Management ("AFM") system in the Generation IV Vortec 5300 Engine sprays oil directly at the piston skirts, which overloads and fouls the piston rings.  (*Id.* at ¶ 9.)  Third, the Generation IV Vortec 5300 Engine includes a flawed PCV system that vacuums atomized oil from the valvetrain into the intake system, where it is ultimately burned in the combustion chambers.  (*Id.* at ¶ 10.)  The excessive oil consumption and resulting issues caused by each of these factors also are exacerbated by the fact that vehicles with the Generation IV Vortec 5300 Engine are equipped with an Oil Life Monitoring System and oil pressure gauge that fail to alert drivers when their vehicles are low on oil.  (*Id.* at ¶¶ 11-13.)

The oil consumption defect can damage critical engine components and cause drivability problems.  (*Id.* at ¶¶ 15, 91-104.)  For example, insufficient oil and lubricity resulting from the oil consumption defect can cause vehicles' engines to overheat and potentially catch fire and to seize and shutdown unexpectedly if the engine experiences enough damage.  (*Id.* at ¶¶ 97-98.)  In addition,

excessive oil getting past the piston rings and fouling spark plugs can cause engine misfires and engine shutdown that can leave drivers stranded and without the use of their vehicles, as well as result in sluggish throttle responses that place occupants in harm's way as they interact with other traffic. (*Id.* at ¶¶ 101-02.)  The specific internal engine components subject to wear and failure as a result of the oil consumption defect include pistons, cylinder walls, rings, valves, valve guides, valve stem seals, lifters, push rods, camshafts, rockers, bearings, piston rods, wrist pins, crankshafts, and timing chain components.  (*Id.* at ¶ 92.)

Plaintiffs allege that GM was aware of the oil consumption defect as early as 2008 and that GM continued to look into the cause of the engine's excessive oil consumption in the following years. (*Id.* at ¶¶ 105-33.)[1]  For example, in 2010, an investigation concluded that "[o]il consumption clearly follows the piston/ring assembly."  (*Id.* at ¶ 108.)  Additionally, in August 2011, through teardowns of in-warranty Generation IV Vortec 5300 Engines, GM noted that piston ring wear allowed oil to migrate past the piston rings and that oil consumption caused engine component failure.  (*Id.* at ¶ 111.)  A GM engineer, Steve Pfromm, also admitted that he became aware of excessive oil consumption from warranty data at least as early as the "2009, early 2010 time frame."  (*Id.* at ¶ 121.)

As a result of its investigations, GM implemented minor production-level modifications ("breakpoints") aimed at remedying the oil consumption defect.  (*Id.* at ¶ 112.)  Specifically, in October 2010, GM shielded the AFM relief valve by directing oil spray downward into the sump, and, in February 2011, GM designed a new PCV cover in an attempt to better separate the oil/air mixture passing through the valve train and into the intake via engine vacuum.  (*Id.* at ¶ 113.)

---

[1] Also starting in 2008, numerous consumers complained about excessive oil consumption in GM vehicles equipped with Generation IV Vortec 5300 Engines to the National Highway Traffic Safety Administration and on online websites such as carcomplaints.com.  (Doc. No. 1 at ¶¶ 126, 134-59.)

According to GM engineers, installing the AFM shield and modified PCV cover did not cure the oil consumption defect.  (*Id.* at ¶¶ 114-20.)  The design flaws causing the oil consumption defect were fixed, however, in the redesigned Generation V Vortec 5300 Engines, which GM began designing as early as May 2011.  (*Id.* at ¶ 125.)

Between August 2010 and November 2014, GM also issued multiple Technical Service Bulletins ("TSBs") addressing the oil consumption issue.  (*Id.* at ¶¶ 129-33.)  The TSBs stated that the oil loss in vehicles with Generation IV Vortec 5300 Engines could be caused by two conditions: (a) oil pulled through the PCV system; or (b) oil spray that is discharged from the AFM system's pressure relief valve within the crankcase.  (*Id.* at ¶ 130.)  The TSBs suggested fixes for each of these issues, but recognized that neither fix may solve the oil loss problem.  (*Id.*)  Rather, the TSBs stated that the ultimate fix for the oil consumption problem was the replacement of the piston assemblies. (*Id.*)

### ii.  Jennings

In 2013, Jennings purchased a new 2013 Chevrolet Silverado equipped with a Generation IV Vortec 5300 Engine from Coughlin GM of Marysville in Marysville, Ohio.  (*Id.* at ¶ 34.)  In 2016, Jennings first noticed that her Silverado consumes an unusually high volume of oil.  (*Id.* at ¶¶ 35-36.) Jennings' vehicle has suffered numerous engine problems while under warranty, which are due to excessive oil consumption and corresponding inadequate lubricity.  (*Id.* at ¶ 37.)  Specifically, Jennings' vehicle has, in the course of normal operation, suffered a broken camshaft, failed lifters, and rough idle, and she has had to have the camshaft, lifters, and spark plugs in her vehicle replaced. (*Id.*)

Prior to her purchase, Jennings spoke with a sales representative at Coughlin GM, saw commercials for the 2013 Chevrolet Silverado that promoted the truck's reliability and durability, and saw a Monroney sticker on the vehicle.  (*Id.* at ¶ 40.)  At no point did GM disclose the oil consumption defect to Jennings.  (*Id.* at ¶¶ 39-41.)  Had GM done so, Jennings would not have purchased her Silverado or would have paid less for it.  (*Id.* at ¶ 42.)

### iii.  Airko

In 2016, Airko, an Ohio corporation, purchased a used 2013 Chevrolet Silverado equipped with a Generation IV Vortec 5300 Engine from Pat O'Brien Chevrolet in Westlake, Ohio.  (*Id.* at ¶ 26.)  Airko noticed, and was informed by mechanics, that its Silverado consumed an unusually high volume of oil.  (*Id.* at ¶ 27.)  Airko's vehicle also suffered engine failure due to reduced lubricity resulting from the oil consumption defect.  (*Id.* at ¶ 28.)  As a result of the engine damage, Airko was forced to purchase a new engine for the vehicle.  (*Id.*)

Prior to Airko's purchase, Mark Gilbert, President of Operations of Airko, spoke with a sales representative at Pat O'Brien Chevrolet, saw commercials for the 2013 Chevrolet Silverado that promoted the truck's reliability and durability, and saw a Monroney sticker on the vehicle.  (*Id.* at ¶ 30.)  At no point did GM disclose the oil consumption defect to Airko.  (*Id.* at ¶¶ 29-31.)  Had GM done so, Airko would not have purchased its Silverado or would have paid less for it.  (*Id.* at ¶ 32.)

### b.  Procedural History

On November 24, 2020, Plaintiffs filed a Class Action Complaint ("Complaint") against GM, seeking to represent a class of all current and former owners and lessees of vehicles containing the allegedly defective Generation IV Vortec 5300 Engine produced after GM emerged from bankruptcy on July 10, 2009 ("Class Vehicles") that were purchased or leased in the State of Ohio.  (*Id.* at ¶¶

198-99.)   In their Complaint, Plaintiffs set forth five claims against GM: violation of the Ohio Consumer Sales Practices Act ("OCSPA") (Count 1);[2] breach of express warranty (Count 2); breach of implied warranty in tort (Count 3); fraudulent omission (Count 4); and unjust enrichment (Count 5).  (*Id.* at ¶¶ 208-56.)

In response, on January 29, 2021, GM filed a Motion to Dismiss, asserting that all of the counts in Plaintiffs' Complaint should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. Nos. 10, 11.)  Plaintiffs filed a brief in opposition to GM's Motion to Dismiss on March 1, 2021, to which GM replied on March 15, 2021.  (Doc. Nos. 15, 16.)  On May 14, 2021, Plaintiffs also filed a Notice of Supplemental Authority, to which GM replied on May 17, 2021. (Doc. Nos. 21, 22.)

## II.   Standard of Review

Under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough

---

[2] Only Jennings sets forth a claim under the OCSPA.  (Doc. No. 1 at ¶ 208.)

facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."'" *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

## III.   Analysis

### a.   Ohio Consumer Sales Practices Act

#### i.   Jennings' Individual Claim Under the Ohio Consumer Sales Practices Act

In Count 1 of the Complaint, Jennings alleges that GM violated the OCSPA by selling her a vehicle while concealing its oil consumption defect.  (Doc. No. 1 at ¶¶ 208-21.)  In its Motion to Dismiss, GM argues that Jennings has failed to state a claim under the OCSPA because the mere nondisclosure of a defect is not a deceptive or unconscionable practice prohibited by the OCSPA,

because GM had no knowledge of the defect at the time of sale, and because Jennings' claim is barred by the statute of limitations.  (Doc. No. 11 at 14-15, 17.)  In response, Jennings argues that she has adequately alleged a claim under the OCSPA and that her claim is not time barred pursuant to various tolling doctrines.  (Doc. No. 15 at 17-20.)  Upon review of the parties' arguments, the Court concludes that dismissal is inappropriate with respect to Jennings' individual claim under the OCSPA.

As a threshold issue, the Court will first address GM's argument that Jennings' individual claim is barred by the statute of limitations.  Claims under the OCSPA are subject to a two-year statute of limitations.  Ohio Rev. Code § 1345.10(C).  "Where a plaintiff seeks recovery of damages under the CSPA, the limitations period is absolute, and the discovery rule does not apply."  *Zaremba v. Marvin Lumber and Cedar Co.*, 458 F. Supp. 2d 545, 552 (N.D. Ohio 2006).  Thus, "[w]hen a plaintiff brings an OCSPA claim based on alleged misrepresentations about the 'standard, quality, or grade' of a purchased consumer good, the statute of limitations begins to run from the time of purchase."  *Mooradian v. FCA US, LLC*, No. 1:17–cv–1132, 2017 WL 4869060, at *8 (N.D. Ohio Oct. 27, 2017).

Here, Jennings does not dispute that she did not file her claim under the OCSPA within two years of her purchase.  Indeed, Jennings bought her vehicle in 2013 and did not file the instant action until November 2020.  (Doc. No. 1 at ¶ 34.)  Nonetheless, Jennings asserts that her individual claim is timely because it has been tolled as a result of GM's fraudulent concealment and the class action tolling doctrine.  (Doc. No. 15 at 19-20.)

With respect to Jennings' fraudulent concealment argument, "under certain circumstances Ohio law recognizes that the concealment of a cause of action can toll the statute of limitations."  *Phelps v. Lengyel*, 237 F. Supp. 2d 829, 836 (N.D. Ohio 2002).  "In order for concealment to toll the

8

statute of limitations, courts have generally held that there must be something of an affirmative character designed to prevent, and which does prevent, discovery of the cause of action; or some actual artifice to prevent knowledge of the fact; or some affirmative act of concealment or some misrepresentation to exclude suspicion and prevent inquiry." *Id.*  In other words, "plaintiffs must 'establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit.'" *Thornton v. State Farm Mut. Auto Ins. Co., Inc.*, No. 1:06-cv-00018, 2006 WL 3359448, at *6 (N.D. Ohio Nov. 17, 2006) (quoting *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 502 (2006)).

In this case, Jennings has made sufficient allegations of concealment to support the tolling of the statute of limitations, making dismissal inappropriate at this stage.  Initially, the Court finds that Jennings has adequately alleged that GM was aware of the oil consumption defect prior to the sale of her vehicle in 2013.  Significantly, Jennings has identified specific investigations conducted by GM and statements by GM employees indicating that GM knew of the defect as early as the 2009 to 2010 timeframe.  For example, Jennings alleges that in 2010, an investigation concluded that "[o]il consumption clearly follows the piston/ring assembly."  (Doc. No. 1 at ¶ 108.)  Jennings also alleges that a GM engineer, Steve Pfromm, admitted that he became aware of excessive oil consumption from warranty data at least as early as the "2009, early 2010 time frame." (*Id.* at ¶ 121.)  Additionally, Jennings alleges that in August 2011, through teardowns of in-warranty Generation IV Vortec 5300 Engines, GM noted that piston ring wear allowed oil to migrate past the piston rings and that oil consumption caused engine component failure.  (*Id.* at ¶ 111.)[3]  As additional support for GM's

---

[3] In support of its argument that Jennings' allegations are insufficient to establish GM's knowledge of the defect, GM relies on the court's ruling in *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280 (N.D. Ohio 2020), which addressed claims based on the same alleged oil consumption defect.  (Doc. No. 16 at 10.)  There, the court found the plaintiff's allegations

awareness of the defect, Jennings also points to her allegations regarding the first oil consumption defect related TSB that was implemented in August 2010, the design changes in the Generation IV Vortec 5300 Engine in October 2010 and February 2011 that were made to address the oil consumption defect, and the numerous consumer complaints regarding excessive oil consumption that predate Jennings' purchase.  (Doc. No. 15 at 15-16.)[4]  Taken as true, these allegations are sufficient to plausibly establish that GM had knowledge of the oil consumption defect prior to the sale of Jennings' vehicle.

Further, Jennings' allegations regarding the TSBs issued by GM are sufficient to support an inference that GM actively concealed the defect from consumers, such as Jennings.  The same alleged oil consumption defect was at issue in a separate class action brought in *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2020 WL 1955643 (N.D. Cal. Apr. 23, 2020).  In that case, on summary judgment, the court held that the plaintiffs had established a genuine issue of material fact as to whether GM actively concealed information about the alleged oil consumption defect based on evidence of GM's issuance of TSBs that it knew did not actually fix the problem.  *Sloan*, 2020 WL 1955643, at *15-16.  The court concluded that "active concealment exists where—as here—a company implements a 'fix' it knows is not effective." *Id.* at *15.  Likewise, here, Jennings alleges that although GM knew that ring wear was causing excessive oil consumption, it did not act to remedy

---

failed to support an inference that GM had knowledge of the defect.  *Szep*, 491 F. Supp. 3d at 293-95.  However, it does not appear that any of Jennings' allegations regarding GM's investigations or statements by GM employees were before the court in *Szep*.  *See id.*  Given Jennings' additional allegations, the Court finds *Szep* distinguishable.  The Court also finds unpersuasive GM's argument that Jennings' allegations are insufficient because GMC's knowledge prior to its bankruptcy cannot be imputed to GM.  (Doc. No. 16 at 11-12.)  As shown above, several of Jennings' allegations are based on statements and findings after GM emerged from bankruptcy on July 10, 2009.

[4] GM argues that allegations regarding the TSBs, design changes, and consumer complaints are insufficient to establish knowledge.  (Doc. No. 11 at 10-13.)  While these allegations may have been inadequate on their own, the Court finds that they add additional support for Jennings' other allegations regarding GM's knowledge of the defect.

10

this issue or provide its customers with an effective warranty repair.  (Doc. No. 1 at ¶ 183.)  Instead, Jennings alleges that GM's TSBs required dealers to perform the ineffective piston cleaning and breakpoint modifications before authorizing dealers to proceed with piston assembly replacement.  (*Id.* at ¶¶ 183-84.)  According to Jennings, GM knew these fixes were not effective, but GM never changed its diagnosis and repair regimen through the issuance of the final TSB in November 2014.  (*See id.* at ¶¶ 116-17, 124, 131-33.)  For instance, Jennings alleges that the first TSB issued in August 2010 involved a piston cleaning procedure that a GM engineer had previously documented was ineffective in a February 2010 report.  (*Id.* at ¶ 131.)  Therefore, the Court finds Jennings' allegations regarding GM's concealment of the defect sufficient to support the tolling of her claim under the OCSPA.

In addition, Jennings' claim is subject to class action tolling.  "[T]he filing of a class action, whether in Ohio or the federal court system, tolls the statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Vaccariello v. Smith & Nephew Richards, Inc.*, 94 Ohio St.3d 380, 382-83 (2002).  Here, Jennings' claims are tolled by *Sloan*, which was filed on December 19, 2016, made essentially identical allegations against GM, and included a putative class of Ohio consumers.  *See Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC (N.D. Cal.) (Dkt. 2).  Based on GM's alleged fraudulent concealment and the class action tolling doctrine, the Court finds it inappropriate to dismiss Jennings' OCSPA claim as untimely at this stage of the litigation.

Accordingly, the Court must assess GM's arguments with respect to the merits of whether Jennings has sufficiently stated a claim under the OCSPA.  Generally, the OCSPA prohibits suppliers from committing a deceptive or unconscionable act or practice in connection with a consumer

transaction. Ohio Rev. Code §§ 1345.02, 1345.03. "Because the CSPA 'is a remedial law which is designed to compensate for traditional consumer remedies,' a court must liberally construe it." *Davis v. Byers Volvo*, No. 11CA817, 2012 WL 691757, at *7 (Ohio Ct. App. 4th Dist. Feb. 24, 2012) (quoting *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29 (1990)). "In order to make out a prima facie claim under the OCSPA, the plaintiff must show a material misrepresentation, deceptive act or omission that impacted his decision to purchase the item at issue." *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 297 (N.D. Ohio 2020) (internal quotations omitted) (quoting *Temple v. Fleetwood Enters.*, 133 F. App'x 254, 265 (6th Cir. 2005)).

Courts appear to be somewhat divided as to whether nondisclosure of a defect, without more, is a deceptive or unconscionable act prohibited by the OCSPA. *Compare Radford v. Daimler Chrysler Corp.*, 168 F. Supp. 2d 751, 754 (N.D. Ohio 2001) ("Ohio caselaw holds that '[m]ere non-disclosure of a defect, without more, does not fall within the purview of deceptive or unconscionable practices prohibited by the Act.'") (quoting *Bierlein v. Bernie's Motor Sales, Inc.*, No. 9590, 1986 WL 6757, at *7 (Ohio Ct. App. 2d Dist. June 12, 1986)), *with In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 871 (S.D. Ohio 2012) ("Omissions are actionable under the OCSPA if they 'concern a matter that is or is likely to be material to a consumer's decision to purchase the product or service involved.'"), *and Bellinger v. Hewlett Packard Co.*, No. 20744, 2002 WL 533403, at *2 (Ohio Ct. App. 9th Dist. Apr. 10, 2002) ("This Court declines to hold, as HP has urged, that a failure to disclose information in the absence of an affirmative representation that is false or inaccurate can never give rise to an actionable claim under the CSPA.").

However, the Court need not necessarily decide that issue, as there are additional allegations beyond GM's nondisclosure of the defect to support Jennings' OCSPA claim. As discussed above,

Jennings also has alleged that GM was aware of the oil consumption defect and actively concealed it from consumers. Given the additional allegations in that regard and the fact that the OCSPA is a remedial law that should be construed liberally, the Court concludes that Jennings has adequately stated a claim under the OCSPA at this stage of the litigation. Therefore, GM's Motion to Dismiss Jennings' individual claim under the OCSPA is denied.

### ii. Jennings' Class Claim Under the Ohio Consumer Sales Practices Act

Although Jennings' individual claim is adequately pled, the Court still must assess whether she may bring a class action under the OCSPA. To wit, GM asserts that even if Jennings' individual claim under the OCSPA survives, Jennings cannot satisfy the previous violation requirement for class actions under the OCSPA, and her class claim should therefore be dismissed. (Doc. No. 11 at 15-17.) In opposition, Jennings contends that whether she has satisfied the previous violation requirement for bringing a class action under the OCSPA is properly determined at class certification, not on a motion to dismiss. (Doc. No. 15 at 18.) Alternatively, Jennings argues that even if the Court decides to assess the issue at this stage, she has satisfied the requirement and her class claim under the OCSPA should be allowed to proceed. (*Id.* at 18-19.) The Court finds that Jennings has failed to satisfy the requirements to bring a class action under the OCSPA.

"Under the OCSPA, consumers may seek relief in a class action only if the defendant was sufficiently on notice that its conduct was deceptive or unconscionable under the statute at the time it committed the alleged acts." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d at 868. This means that "[p]laintiffs bringing claims on behalf of a class must demonstrate that either (1) the alleged violation is an act or practice that was declared to be deceptive or unconscionable by a rule adopted by the Attorney General before the consumer transaction on which the action is based or (2) the

13

alleged violation is an act or practice that was determined by a court to violate the OCSPA and the court's decision was available for inspection before the transaction took place." *Id.* (citing Ohio Rev. Code § 1345.09(B)).

Importantly, "there must be a substantial similarity between a defendant's alleged violation of the Act and an act or practice previously declared deceptive by either a rule promulgated by the Attorney General or a court decision that was publicly available when the alleged violation occurred." *Marrone v. Philip Morris USA, Inc.*, 110 Ohio St.3d 5, 10 (2006). "'Substantial similarity' means a similarity not in every detail, but in essential circumstances or conditions." *Id.* "Cases that involve industries and conduct very different from the defendant's do not provide meaningful notice of specific acts or practices that violate the CSPA." *Id.* at 9. Nor do "generic prohibition[s] that do[] not refer to any specific act or practice." *Id.* at 11.

Some courts have declined to address whether this prior notice requirement has been satisfied at the motion to dismiss stage, finding it more appropriate to wait until class certification or summary judgment. *E.g.*, *Chapman v. Tristar Products, Inc.*, No. 16–cv–1114, 2016 WL 6216135, at *4 (N.D. Ohio Oct. 25, 2016). However, other courts have chosen to address the issue at the pleadings stage, reasoning that "[a] court should not allow class claims to continue if it only would be delaying inevitable dismissal." *Gascho v. Global Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 693 (S.D. Ohio 2012); *see also In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d at 868-69. The Court agrees that there is no reason to delay and will consider the issue.

In her opposition to GM's Motion to Dismiss, Jennings relies on three cases that she asserts involved conduct substantially similar to GM's alleged wrongful actions that support her class claim under the OCSPA. (Doc. No. 15 at 19.) First, Jennings cites *State ex rel Montgomery v. Ford Motor*

14

*Co.* (OPIF No. 10002123).  (Doc. No. 15 at 19.)  However, that case involved a published settlement agreement entered without any findings of fact, law, or liability and cannot constitute sufficient notice to GM.  *Vuyancih v. Jones & Associates Law Grp., L.L.C.*, 95 N.E.3d 458, 462 (Ohio Ct. App. 8th Dist. 2018) ("[C]onsent or default judgments do not suffice as notice under R.C. 1345.09(B)—these judgments have no analysis of any kind that put a defendant on notice that its specific conduct was deceptive or unconscionable under the CSPA.").

Second, Jennings cites *Borror v. MarineMax of Ohio*, No. OT–06–010, 2007 WL 431737 (Ohio Ct. App. 6th Dist. Feb. 9, 2007).  (Doc. No. 15 at 19.)  But that case also is insufficient to provide notice to GM, as the conduct involved is not substantially similar.  In *Borror*, the plaintiff alleged that the seller of a boat concealed the fact that the boat had been involved in a serious accident prior to the sale, instead representing the boat to have sustained only minor, non-structural damage. 2007 WL 431737, at *1-2, *8.  Unlike the instant matter, there were no allegations regarding the manufacturer's concealment of a design defect.

Finally, Jennings cites *Mason v. Mercedes-Benz USA, LLC*, No. 85031, 2005 WL 1995087 (Ohio Ct. App. 8th Dist. Aug. 18, 2005).  (Doc. No. 15 at 19.)  However, the conduct involved in *Mason* is not substantially similar to the conduct at issue here either.  In *Mason*, the court held that the defendant had violated the OCSPA by selling a vehicle that had a multitude of different problems that required the plaintiff to have the car in for repairs twenty times over a two-year period.  2005 WL 1995087, at *5.  This is different from the sale of a vehicle by GM that contains a single alleged design defect.  *See In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d at 870 ("The conduct alleged in *Mason* is therefore unlike the conduct alleged here, in which PCNA allegedly placed a vehicle into the stream of commerce with one defect that required repair on one occasion.").  Because Jennings

15

has failed to satisfy Ohio Rev. Code § 1345.09(B), she is precluded from advancing an OCSPA claim on behalf of a class.  Accordingly, the Court grants GM's Motion to Dismiss with respect to Jennings' OCSPA class action allegations.

### b.  Breach of Express Warranty

#### i.  Jennings' Breach of Express Warranty Claim

In Count 2 of the Complaint, Jennings alleges that GM breached its Limited Warranty for the Class Vehicles by failing to repair the oil consumption defect.  (Doc. No. 1 at ¶¶ 222-39.)  GM asserts Jennings' claim in Count 2 should be dismissed because the Limited Warranty does not cover the alleged defect, and Jennings failed to give pre-suit notice of GM's alleged breach as required under Ohio law.  (Doc. No. 11 at 4-6.)  In opposition, Jennings contends that the Limited Warranty does cover the oil consumption defect and that sufficient notice was provided or should be excused as futile.  (Doc. No. 15 at 4-9.)  The Court concludes that dismissal is inappropriate with respect to Jennings' claim.

First, the Court considers whether the Limited Warranty for the Class Vehicles applies to the alleged oil consumption defect.  The relevant language of the warranty provides:

> [T]he warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship occurring during the warranty period.

(Doc. No. 1 at ¶ 226.)

According to GM, this clause does not cover repairs to design defects because it is limited to defects "related to materials or workmanship," which is a specialized warranty phrase that refers

16

exclusively to manufacturing defects.  (Doc. No. 11 at 4-6.)[5]  In support of this interpretation, GM contends, in effect, that the warranty should be read as if a comma was included after "vehicle," such that the warranty would cover "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle[,] related to materials or workmanship occurring during the warranty period."  In other words, defects related to slight noise, vibrations, and other normal characteristics of the vehicle are separate and excluded from coverage, and coverage is limited to "any vehicle defect . . . related to materials and workmanship occurring during the warranty period." (Doc. No. 16 at 3.)  GM asserts that because the oil consumption defect is a design defect—not a manufacturing defect or defect "related to materials or workmanship"—it is not covered by the warranty.

In contrast, Jennings argues that without a comma separating "vehicle" from "related to materials or workmanship," the Limited Warranty plainly states that it covers "any vehicle defect," except "slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship occurring during the warranty period."  (Doc. No. 15 at 4-6.)  In other words, under Jennings' interpretation, the phrase "related to materials or workmanship" does not modify or limit the phrase "any vehicle defect."  Instead, the phrase "related to materials or workmanship" modifies the phrase "other normal characteristics of the vehicle" or, possibly, the longer phrase "slight noise, vibrations, or other normal characteristics of the vehicle."  Thus, Jennings contends that the oil

---

[5] "A manufacturing defect exists when an item is produced in a substandard condition, and such a defect is often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line. A design defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective."  *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2017 WL 976048, at *11 (N.D. Cal. Mar. 14, 2017) (internal citations and quotations omitted).

17

consumption defect falls within the broad coverage for "any vehicle defect," and the exclusion for "slight noise, vibrations, or other normal characteristics of the vehicle" is not applicable.

"Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Id.* (quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996)). "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous." *Airlink Communications, Inc. v. Owl Wireless, LLC*, No. 3:10 CV 2296, 2011 WL 4376123, at *2 (N.D. Ohio Sept. 20, 2011) (internal citations omitted). "Contractual language is ambiguous 'only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations.'" *Savedoff*, 524 F.3d at 763 (quoting *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 10th Dist. 2003)). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *JBlanco Enterprises v. Soprema Roofing and Waterproofing, Inc.*, No. 1:13–cv–2831, 2016 WL 6600423, at *4 (N.D. Ohio Nov. 8, 2016) (quoting *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio*, 15 Ohio St.3d 321, 322 (1984)).

Further, in construing a contract, a court must read and consider the provisions as a whole and not in isolation. *Foster Wheeler Envirespon se, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362-63 (1997). "Courts should not interpret contracts in a way that 'render[s] at least one clause superfluous or meaningless.'" *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio

18

St.3d 193, 200 (2014) (quoting *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 181 (3d Cir. 2011)).

Several courts have considered the same arguments presented by the parties in this case regarding the meaning of the relevant language in the Limited Warranty.  Although not applying Ohio law, these courts have upheld Jennings' proffered interpretation or found that the warranty language was sufficiently ambiguous to preclude dismissal at the motion to dismiss stage.  *See Martell v. Gen. Motors LLC*, No. 3:20-cv-284-SI, 2021 WL 1840759, at *5-9 (D. Or. May 7, 2021); *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1181-82 (S.D. Fla. 2019); *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 756-59 (E.D. Mich. 2019); *Vazquez v. Gen. Motors, LLC*, No. 17-22209-CIV-GAYLES, 2018 WL 447644, at *3-4 (S.D. Fla. Jan. 16, 2018).

The Court agrees with the reasoning of these cases, and, at a minimum, finds that there is an ambiguity in the meaning of the relevant clause of the Limited Warranty that makes dismissal of Jennings' express warranty claims on this basis premature at this stage.  Indeed, the plain language of the warranty indicates that it covers "repairs to correct any vehicle defect" and not "slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship."  In contrast, GM's interpretation would require the Court to insert another comma after "vehicle."  Therefore, GM has not shown that the warranty unambiguously excludes design defects from its coverage.

Nor are GM's other arguments in support of its interpretation persuasive.  GM argues that under Jennings' construction, the warranty would exclude precisely what a reasonable consumer would expect the warranty to cover.  (Doc. No. 16 at 2.)  However, as the court in *Martell* found, GM's interpretation would not necessarily align better with a reasonable consumer's expectations.

2021 WL 1840759, at *8 ("GM asserts that a reasonable consumer would make this revision to *reduce* the scope of the express warranty's coverage to manufacturing defects only. GM, however, offers no reason for why a reasonable consumer would not expect their express warranty to include faulty design, and further why a reasonable consumer would rewrite the plain text of an express warranty to reduce its coverage."). GM also argues that Jennings' interpretation would render the phrase "occurring during the warranty period" superfluous and contradict other language in the warranty that imposes clear time and mileage limitations. (Doc. No. 16 at 2-3.) But that argument also does not unambiguously establish that GM's interpretation is the correct one. *See Martell*, 2021 WL 1840759, at *9 ("The inclusion of time-limiting text in a provision already covered by time-limiting test may be redundant and unnecessary, but it does not contradict or render absurd the plain text and meaning of the clause when considered under the other terms of the express warranty, which provide that the entire warranty is only valid for a limited period."). Finally, GM relies on numerous cases holding that the same Limited Warranty at issue in this case only covers design defects in accordance with GM's asserted interpretation, but none of those cases addressed the argument advanced by Jennings in this case regarding the full text of the warranty. *See Szep*, 491 F. Supp. 3d at 291-92; *Harris v. Gen. Motors LLC*, No. C20-257 TSZ, 2020 WL 5231198, at *3 (W.D. Wash. Sept. 2, 2020); *Hindsman v. Gen. Motors LLC*, No. 17-cv-05337-JSC, 2018 WL 2463113, at *5-6 (N.D. Cal. June 1, 2018); *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *8 (N.D. Cal. Aug. 1, 2017). Therefore, the Court concludes that dismissal on this basis is not appropriate.[6]

---

[6] Because the Court concludes that the Limited Warranty is not unambiguously limited to manufacturing defects, the Court need not address Jennings' alternative argument that the oil consumption defect is covered under the warranty because the defect is related to "materials."

20

Thus, the Court next must assess the parties' arguments with respect to whether Jennings provided GM sufficient notice of its alleged breach.  "Under Ohio law, to state a breach of express warranty claim, 'a plaintiff must allege: (1) the existence of a warranty; (2) the product failed to perform as warranted; (3) the plaintiff provided the defendant with reasonable notice of the defect; and (4) the plaintiff suffered an injury as a result of the defect.'"  *Painter v. Woodstream Corp.*, No. 1:18 CV 2872, 2019 WL 12346962, at *3 (N.D. Ohio July 15, 2019) (quoting *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 753 (N.D. Ohio 2010)).

More specifically, with respect to the third element, Ohio's Uniform Commercial Code requires that a "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Ohio Rev. Code § 1302.65(C)(1).  This notice requirement serves two purposes: "(1) to provide an opportunity for negotiation and settlement; and, (2) to minimize the possibility of prejudice to the seller by allowing an opportunity to cure the defect, investigate the claim, properly defend, or minimize damages while the facts are fresh in the minds of the parties."  *Galoski v. Stanley Black & Decker, Inc.*, No. 1:14 CV 553, 2015 WL 5093443, at *6 (N.D. Ohio Aug. 28, 2015).  "Whether notice is adequate and reasonable is generally a question of fact to be determined from the totality of the circumstances."  *Lincoln Elec. Co. v. Technitrol, Inc.*, 718 F. Supp. 2d 876, 881 (N.D. Ohio 2010).

Typically, "to properly assert breach of warranty claims, Plaintiffs must allege that they provided Defendant with proper *pre-litigation* notice under § 1302.65."  *Vinson v. J.M. Smucker Co.*, No. CV 12–4936–GHK (VBKx), 2013 WL 6987087, at *9 (C.D. Cal. Mar. 25, 2013) (emphasis added); *St. Clair v. Kroger Co.*, 581 F. Supp. 2d 896, 903 (N.D. Ohio 2008) ("The policy reasons for pre-litigation notice are not satisfied by the filing of a complaint.  I conclude that plaintiff's failure to

21

provide defendant with pre-litigation notification requires dismissal of her UCC claim.").  However, in *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, the Supreme Court of Ohio explicitly declined to adopt an "absolute rule" requiring pre-suit notice, indicating that "in a proper case the filing of a civil complaint could serve as notice of breach."  42 Ohio St.3d 40, 54 (1989).  While the Supreme Court did not further elaborate as to what would constitute a proper case, it held that a suit "filed a full two years after the damages were sustained" was inadequate notice as a matter of law.  *Id.*

"Although the Ohio Supreme Court did not specify and courts are conflicted as to when a case is proper pursuant to *Chemtrol*, 'cases suggest[ ] that a "proper case" is at least one where the filing of the Complaint is itself sufficient to fulfill the purposes of the prelitigation requirement, e.g., where prelitigation settlement discussions would be futile, where the defendant has notice of the potential claims, and where the complaint is filed soon after the damages are sustained, giving the defendant the opportunity to minimize the damage, cure the defect, or preserve facts necessary to defend himself.'"  *Painter*, 2019 WL 12346962, at *5 (quoting *Vinson*, 2013 WL 6987087, at *9); *see also Albright v. Sherwin-Williams Co.*, No. 1:17 CV 2513, 2019 WL 5307068, at *3 (N.D. Ohio Jan. 29, 2019) ("In an attempt to determine when a complaint can serve as notice, federal courts have looked primarily to two factors: whether the defendant had any prior knowledge of the defects prior to filing the complaint, and the length of the delay between the alleged breach and the filing of the complaint.").

In this case, neither party explicitly addressed the significance of *Chemtrol* or the factors identified by subsequent cases that affect whether a complaint may serve as adequate notice for a breach of express warranty claim.  However, in opposing GM's Motion to Dismiss, Jennings does argue that GM received notice of the oil consumption defect well before the filing of her Complaint

22

through another action against GM that has been pending since 2016 based on the same allegations at issue here.  (Doc. No. 15 at 8.)  Specifically, in December 2016, a separate action was filed against GM in the United States District Court for the Northern District of California, which included a putative Ohio class setting forth claims for breach of express warranty based on essentially the same allegations regarding the oil consumption defect in GM's vehicles.  *See Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC (N.D. Cal.) (Dkts. 2, 29, 67.)  Further, Jennings asserts that notice would have been futile because GM has known of its alleged breaches of warranty for years as a result of the *Sloan* action, but has refused to address the issue and has instead denied the existence of the oil consumption defect.  (Doc. No. 15 at 9.)  Because Jennings has alleged that GM knew of the potential claims prior to her suit and that any prelitigation settlement discussions would have been futile, the Court finds that it is at least plausible that the filing of this action constituted adequate notice to GM. Therefore, at this stage of the litigation, the Court declines to dismiss Jennings' breach of express warranty claims based on a lack of sufficient notice.  *See Siriano v. Goodman Mfg. Co.*, No. 2:14-cv-1131, 2015 WL 12748033, at *9 (S.D. Ohio Aug. 18, 2015) (declining to dismiss breach of warranty claim on lack-of-notice grounds where neither party addressed *Chemtrol* and it was plausible that the complaint constituted adequate notice).[7]  Therefore, GM's Motion to Dismiss Jennings' express warranty claim is denied.[8]

---

[7] The Court acknowledges that the delay between the alleged breach and the filing of Jennings' Complaint is one factor that potentially weighs against a finding that the Complaint can serve as notice, given that Jennings alleges to have first noticed her vehicle's excessive oil consumption in 2016 and did not file her Complaint until November 2020.  (Doc. No. 1 at ¶ 36.)  However, the Court finds an assessment of these competing factors is more appropriate at the summary judgment stage, especially given the parties' failure to fully address them.

[8] To the extent that Plaintiffs argue that the *Sloan* action constituted notice on behalf of Plaintiffs by itself under Ohio law or that the futility of the notice independently excused any notice requirement, the Court need not address those arguments at this time given its holding above based on *Chemtrol*'s "proper case" exception.

#### ii. Airko's Breach of Express Warranty Claim

In Count 2 of the Complaint, Airko sets forth the same express warranty claim as Jennings based on GM's alleged breach of the Limited Warranty.  (Doc. No. 1 at ¶¶ 222-39.)  GM moves to dismiss Airko's claim based on the same arguments addressed above regarding the coverage of the Limited Warranty and the lack of pre-suit notice.  (Doc. No. 11 at 4-6.)  The foregoing analysis is identical with respect to Airko, and, therefore, neither basis supports the dismissal of Airko's claim. However, GM argues that Airko's claim fails for the additional reason that it has failed to allege that its vehicle experienced the alleged defect or that it sought repairs during the warranty term.  (*Id.* at 6-7.)  The Court agrees.

"[A] manufacturer's liability for breach of an express warranty 'derives from, and is measured by, the terms of that warranty.'"  *Davisson v. Ford Motor Co.*, No. 2:13–CV–00456, 2014 WL 4377792, at *6 (S.D. Ohio Sept. 3, 2014) (quoting *Cipollone v. Ligget Grp., Inc.*, 505 U.S. 504, 525 (1992)).  Thus, to state a claim, plaintiffs must allege that they experienced problems during the period covered by the warranty.  *Id.*; *see also In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d at 818 (holding plaintiffs failed to adequately allege a breach of express warranty claim when "no plaintiff claims to have had any problems with his or her coolant pipes until after the applicable warranty term expired"); *M.L. Simmons, Inc. v. Bellman Plumbing, Inc.*, No. 67832, 1995 WL 396349, at *7 (Ohio Ct. App. 8th Dist. July 6, 1995) ("The defects in the sink did not manifest themselves until after the warranty period.  Thus, the court's determination that appellants could not recover for breach of express warranty for the sink was supported by competent, credible evidence.").

In the instant matter, Airko has not specifically pled that it experienced the alleged defect during the warranty term.  Instead, Airko argues that it has sufficiently stated a claim because it

alleges that the oil consumption defect was present in its vehicle from the moment of sale because the piston rings suffered immediate, abnormal wear.  (Doc. No. 15 at 9-10.)  However, courts have "roundly rejected" similar arguments.  *Davisson*, 2014 WL 4377792, at *7 (collecting cases).  For example, in *Davisson*, the court dismissed plaintiffs' breach of express warranty claims and rejected their argument that the "date and mileage of the first defect experience is 'irrelevant' because their theory is 'that Ford breached its warranties by providing Class Vehicles that were defective at the point of sale.'"  *Id.*; *see also Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986) ("[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty. . . . Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. . . . A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage.").  Thus, the Court finds Airko's allegations insufficient to state a claim, and GM's Motion to Dismiss is granted with respect to Airko's breach of express warranty claim.

### c.  Breach of Implied Warranty

### i.  Jennings' Breach of Implied Warranty Claim

In Count 3 of the Complaint, Jennings asserts an implied warranty in tort claim based on GM's sale of an allegedly defective vehicle.  (Doc. No. 1 at ¶¶ 240-46.)  GM argues that Jennings' claim should be dismissed because she drove her car for several years and she has failed to plead that her vehicle was not fit for its ordinary purpose—i.e., safe driving and reliable transportation.  (Doc. No. 11 at 7-8.)  In response, Jennings argues that the oil consumption defect renders her vehicle unreliable and creates a safety risk, which is sufficient to state a claim for breach of implied warranty.  (Doc.

No. 15 at 10-12.)  Upon review of the parties' arguments, the Court concludes that Jennings has adequately stated a claim for breach of implied warranty.

"To maintain a breach of implied warranty in tort claim, the plaintiff 'must allege that (1) a defect existed in a defendant's product that made it unfit for its ordinary, intended use; (2) the defect existed at the time the product left the defendant's possession; and (3) the defect was the proximate cause of the plaintiff's injuries.'"  *Szep*, 491 F. Supp. 3d at 292 (quoting *Mooradian*, 2017 WL 4869060, at *7).

In this case, the parties only dispute whether a defect existed in Jennings vehicle that made it unfit for its ordinary, intended use.  In the consumer vehicle context, courts have held that to satisfy this element, "plaintiffs must adequately allege that their vehicles are not fit for safe driving and reliable transportation."  *Id.* (internal quotations and citation omitted); *see also In re Ford Motor Co., Spark Plug and 3-Valve Engine Products Liab. Litig.*, No. 1:12–md–2316, 2014 WL 3778592, at *42 (N.D. Ohio July 30, 2014) ("For an implied warranty tort to lie, the Court would have to find that the automobiles with these spark plugs are not carrying the consumers from point A to point B in a safe and reliable manner.").

To illustrate, in *In re Porsche Cars*, the court held that the plaintiffs had adequately pled that a defect in a vehicle's coolant tubes rendered the vehicle unfit for its ordinary intended use.  880 F. Supp. 2d at 867.  In that case, the plaintiffs alleged that the defendants defectively designed the vehicle at issue by using plastic coolant tubes instead of aluminum pipes because the plastic coolant tubes would crack and degrade under the extreme heat to which they are exposed.  *Id.* at 813.  The plaintiffs further alleged that cracked coolant tubes "result in 'coolant seeping directly into the vehicle's starter, transmission seals, and other components causing possible engine damage and

26

engine failure,'" "that coolant tube failure renders the vehicle 'inoperable' or can 'disabl[e] the vehicle,'" and that "acute failure of the [coolant tubes] can and sometimes does occur while traveling at high speeds on public roadways." *Id.* at 828 (internal citations omitted). The defendants argued that this alleged defect did not render the vehicles unfit for their ordinary, intended use when the plaintiffs' vehicles outlived their warranties, but the court found this unpersuasive and held that the plaintiffs had sufficiently stated a claim for breach of implied warranty. *Id.* at 867.

Similarly, here, Jennings has alleged that the oil consumption defect can cause engine damage and shutdowns that pose a safety risk to drivers and passengers. Specifically, Jennings alleges Class Vehicles consume excessive amounts of oil based on several defects in the Generation IV Vortec 5300 Engines, but primarily as a result of defective piston rings that fail to keep oil in the crankcase and out of the combustion chamber. (Doc. No. 1 at ¶¶ 8-10.) Jennings further alleges that the insufficient oil and lubricity resulting from the oil consumption defect can cause Class Vehicles' engines to overheat and potentially catch fire and to seize and shutdown unexpectedly if the engines experience enough damage. (*Id.* at ¶¶ 97-98.) Additionally, Jennings alleges that excessive oil getting past the piston rings and fouling spark plugs can cause engine misfires and engine shutdowns that can leave drivers stranded and without the use of their vehicles, as well as result in sluggish throttle responses that place occupants in harm's way as they interact with other traffic. (*Id.* at ¶¶ 101-02.) According to Jennings, all of these risks also are exacerbated because Class Vehicles do not provide any warning of low oil levels until the oil has already reached a level that is concurrent with engine misfire and shutdown. (*Id.* at ¶ 104.) Finally, Jennings alleges that she experienced issues and engine damage herself as a result of the oil consumption defect in the form of a broken camshaft, failed lifters, and rough idle, and she has had to have the camshaft, lifters, and spark plugs in her

27

vehicle replaced.  (*Id.* at ¶ 37.)  The Court finds these allegations sufficient to demonstrate that the oil consumption defect rendered Jennings' car unfit for its ordinary, intended use, and she has therefore adequately stated a claim for breach of implied warranty.[9]

GM argues that Jennings' claim fails because she has owned her vehicle for seven years, and a vehicle that has been driven for several years or thousands of miles satisfies its ordinary purpose and cannot form the basis for a claim of breach of implied warranty.  (Doc. No. 11 at 7-8.)  However, the Court finds the authority relied on by GM in support of its argument easily distinguishable, as none of the cases involved allegations of a defect that similarly impacted the vehicles' safety and operability.  *See Mooradian*, 2017 WL 4869060, at *7 ("Plaintiffs' allegations of intermittent heating and air conditioning failure 'while certainly an annoyance, did not interfere with [their] ability to drive [their] car[s].'"); *In re Ford Motor Co., Spark Plug and 3-Valve Engine Products Liab. Litig.*, 2014 WL 3778592, at *42 ("These Ohio Plaintiffs drove their cars for six years with no problems. They do not allege their spark plugs ever gave them a problem, that their vehicles were not safe or their vehicles were not reliable.").  GM also cites to *Szep*, which addressed the same alleged oil consumption defect and in which the court dismissed the plaintiff's implied warranty claim.  (Doc. No. 11 at 8.)  But the plaintiff in *Szep* did "not allege that his vehicle suffered any excessive oil consumption issues or otherwise required repairs for excessive oil consumption during the eight years that he has owned his vehicle" or "that the oil consumption defect causes sudden engine damage or engine failure."  491 F. Supp. 3d at 292.  In contrast, Jennings has specifically alleged that her vehicle

---

[9] This conclusion is further supported by the court's ruling on summary judgment in the *Sloan* action—which involves the same alleged oil consumption defect—concluding that the plaintiffs had presented sufficient evidence that the alleged oil consumption defect is a safety defect within the context of the plaintiffs' implied warranty claims under various other state laws.  *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2020 WL 1955643, at *13 (N.D. Cal. Apr. 23, 2020).

consumed excessive oil, that her vehicle required multiple repairs as a result of the oil consumption defect, and that the oil consumption defect can cause sudden engine damage and failure.  As a result, the Court concludes that Jennings has adequately stated a claim, and the Court denies GM's Motion to Dismiss with respect to Jennings' implied warranty claim.

### ii.  Airko's Breach of Implied Warranty Claim

Airko also asserts a beach of implied warranty claim in Count 3 of the Complaint.  (Doc. No. 1 at ¶¶ 240-46.)  As with Jennings, GM argues that Airko's claim should be dismissed because Airko's vehicle was not unfit for its ordinary purpose.  (Doc. No. 11 at 7-8.)  The Court need not address that issue with respect to Airko, however, as it finds GM's alternative argument dispositive.  Specifically, GM argues that Airko's claim is barred by the economic loss doctrine, which precludes an implied warranty in tort claim seeking purely economic losses by a commercial purchaser.  (*Id.* at 8.)  Airko asserts that the economic loss doctrine is inapplicable to its claim.  (Doc. No. 15 at 12-13.)  But the Court agrees with GM that Airko's claim is precluded and must be dismissed.

In Ohio, "commercial parties—both in and out of privity—are subject to the economic loss rule, which bars common law implied warranty claims among commercial parties."  *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, No. 1:10-CV-01902, 2011 WL 1326034, at *12 n.3 (N.D. Ohio Apr. 6, 2011); *accord Nat'l Interstate Ins. Co. v. Motor Coach Indus., Inc.*, No. 1:11CV 02386, 2012 WL 264577, at *4 (N.D. Ohio Jan. 26, 2012) ("Claims in tort for purely economic damages are not available to commercial buyers lacking privity of contract."); *Apostolos Grp., Inc. v. BASF Constr. Chems., L.L.C.*, No. 25415, 2011 WL 1847723, at *3 (Ohio Ct. App. 9th Dist. May 11, 2011) ("[A] 'common-law action in tort for purely economic loss from defective products, based upon implied

warranty theory, is not available to commercial buyers.'") (quoting *Midwest Ford, Inc. v. C.T. Taylor Co.*, 694 N.E.2d 114, 116-17 (Ohio Ct. App. 9th Dist. 1997)).

Here, Airko does not dispute that it is a commercial buyer and that it seeks to recover only economic losses in this action. Instead, in reliance on *Ohio Dep't of Adm. Serv. v. Robert P. Madison Int'l, Inc.*, 741 N.E.2d 551 (Ohio Ct. App. 10th Dist. 2000), Airko argues that the economic loss doctrine does not distinguish between commercial and non-commercial buyers and only bars claims where the parties are in privity of contract. (Doc. No. 15 at 12-13.) Because Airko did not purchase its vehicle directly from GM, Airko asserts that they are not in privity of contract and that its claim is not barred. (*Id.*) However, the Sixth Circuit has rejected the holding in *Ohio Dep't of Adm. Serv.*, and, in interpreting Ohio law, has instead held that commercial parties lacking privity are foreclosed from recovering under an implied warranty claim. *See HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1029-30 (6th Cir. 2003). Accordingly, GM's Motion to Dismiss is granted with respect to Airko's claim for breach of implied warranty in tort.

### d. Fraudulent Omission

In Count 4 of their Complaint, Plaintiffs set forth claims for fraudulent omission based on GM's alleged failure to disclose the oil consumption defect despite its knowledge of the defect. (Doc. No. 1 at ¶¶ 247-56.) The Court will address Plaintiffs' claims in this regard together, as the arguments with respect to each Plaintiff are identical. GM contends Plaintiffs' fraudulent omission claims should be dismissed because they have failed to plead their claims with sufficient particularity as required by Fed. R. Civ. P. 9(b), because Plaintiffs have failed to adequately plead that GM had knowledge of the defect at the time of the sale of the vehicles, and because GM had no duty to disclose the defect to Plaintiffs. (Doc. No. 11 at 8-14.) Plaintiffs have responded to each of GM's arguments

30

and assert that dismissal of their fraudulent omission claims is unwarranted.  (Doc. No. 15 at 13-17.)

Upon review, the Court finds that Plaintiffs' allegations are insufficient to establish that GM had a

duty to disclose the defect, and dismissal is appropriate.[10]

"Under Ohio law, in order to establish a fraudulent omission claim, the plaintiff must show

'(1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact,

material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its

truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the

representation under circumstances manifesting a right to rely; and (5) injury proximately caused by

the reliance.'"  *Szep*, 491 F. Supp. 3d at 295 (quoting *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874

(6th Cir. 2007)).

Generally, with respect to the first element, parties to a business transaction are under no duty

to disclose information to the other.  *Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co.,*

*L.P.A.*, Nos. 2:04-CV-494, 2:04-cv-584, 2007 WL 2572258, at *15 (S.D. Ohio Sept. 4, 2007).

However, Ohio courts recognize three exceptions to this general rule: "(1) when a fiduciary

relationship exists between the parties, (2) where a special trust or confidence is understood between

the parties, and (3) where disclosure of facts is 'necessary to dispel misleading impressions that are

or might have been created by partial revelation of the facts.'"  *Id.* (quoting *Equal Justice Found. v.*

*Deutsche Bank Trust Co. Americas*, No. C2-04-228, 2006 WL 2795211, at *6 (S.D. Ohio Sept. 27,

2006).  In this case, Plaintiffs do not assert that a fiduciary relationship or special trust or confidence

existed between them and GM.  Instead, Plaintiffs contend that disclosure of the oil consumption

---

[10] Therefore, the Court need not consider the parties' other arguments regarding Plaintiffs' fraudulent omission claims.

31

defect was necessary to dispel misleading impressions that were or might have been created by a partial revelation of the facts.

In cases involving similar allegations to those at issue here, courts have found that defendant car manufacturers did not have a duty to disclose an alleged defect. For instance, in *Sonneveldt v. Mazda Motor of Am., Inc.*, the plaintiffs brought fraud claims under Ohio law, as well as the laws of several other states, based on the defendant's failure to disclose a defect in the water pump of the defendant's vehicles' engines that caused the pump to fail prematurely, which resulted in engine failure and costly repairs. No. 8:19-cv-01298-JLS-KES, 2021 WL 62502, at *1-2. The plaintiffs argued that the defendant had a duty to disclose the defect because it "made partial disclosures regarding the safety and reliability of its vehicles," including advertising the vehicles "as safe, able to get passengers to their destinations 'swiftly and safely,' and subject to 'over 800 inspections.'" *Id.* at *7. But the court held that the plaintiffs had failed to allege a duty to disclose because "representations about quality and safety amount to '"mere puffery," which is not actionable because a reasonable consumer could not rely on it.'" *Id.* (quoting *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 749 (E.D. Mich. 2017)). Similarly, in *Costa v. FCA US LLC*, applying Massachusetts law, which has a similar standard for when a duty to disclose arises, the court found that the defendant car manufacturer's "general statements about the safety of its cars, which amount to non-actionable puffery, do not create a duty to disclose all safety-related facts." No. 20-cv-11810-ADB, 2021 WL 2338963, at *12 (D. Mass. June 8, 2021).

Likewise, in this case, Plaintiffs assert that GM's duty to disclose the oil consumption defect arose from is partial statements regarding the Class Vehicles' safety and dependability. (Doc. No. 15 at 17.) Because such statements are non-actionable puffery, they cannot give rise to a legal duty to

speak or form the basis of a fraud claim.  Consequently, GM's Motion to Dismiss is granted with respect to Plaintiffs' fraudulent omission claims.

### e.  Unjust Enrichment

In Count 5 of their Complaint, Plaintiffs allege that they overpaid for their vehicles and that GM unjustly benefitted from the sale and lease of its defective vehicles at artificially inflated prices due to GM's concealment of the oil consumption defect.  (Doc. No. 1 at 203-10.)  The Court will address Plaintiffs' unjust enrichment claims together, as the arguments with respect to each Plaintiff are identical.  GM argues that dismissal of Plaintiffs' unjust enrichment claims is warranted because of the existence of an express contract in the form of the written GM warranty, because adequate legal remedies exist that preclude Plaintiffs' request for equitable relief, and because Plaintiffs did not confer any benefits directly on GM.  (Doc. No. 11 at 17-18.)  Plaintiffs contest each of these points, arguing that their unjust enrichment claims may be pled in the alternative at this stage and that Ohio law does not require that benefits be conferred directly on the defendant in order to state a claim for unjust enrichment.  (Doc. No. 15 at 20.)  Because Plaintiffs did not purchase their vehicles directly from GM, the Court finds that Plaintiffs have failed to state a claim for unjust enrichment.[11]

A claim for unjust enrichment "arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain."  *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984) (quoting *Hummel v. Hummel*, 133 Ohio St. 520, 525 (1938)).  To establish a claim for unjust enrichment, a party "must demonstrate that (1) he conferred a benefit upon a defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under

---

[11] Therefore, the Court need not consider the parties' other arguments regarding Plaintiffs' unjust enrichment claims.

circumstances where it would be unjust to do so without payment." *RG Long & Assocs., Inc. v. Kiley*, No. CA2014–10–129, 2015 WL 3824365, at *2 (Ohio Ct. App. 12th Dist. June 22, 2015).

In *Johnson v. Microsoft Corp.*, the Supreme Court of Ohio assessed whether the indirect purchaser of a product had conferred a benefit on the defendant sufficient to state a claim for unjust enrichment. 106 Ohio St.3d 278, 286 (2005). There, the plaintiff brought an unjust enrichment claim against Microsoft after she purchased a computer that came preinstalled with Microsoft's operating system. *Id.* at 279. The plaintiff purchased the computer from a retailer, however, not directly from Microsoft. *Id.* The court affirmed the dismissal of the plaintiff's unjust enrichment claim, holding:

> The rule of law is that an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser. The facts in this case demonstrate that no economic transaction occurred between Johnson and Microsoft, and, therefore, Johnson cannot establish that Microsoft retained any benefit "to which it is not justly entitled." *Keco Industries*, 166 Ohio St. at 256, 2 O.O.2d 85, 141 N.E.2d 465.

*Id.* at 286.

Applying *Microsoft*, courts have held that "unjust enrichment is not an available remedy when a plaintiff does not make her purchase directly from the manufacturer." *Young v. Carrier Corp.*, No. 4:14CV0974, 2014 WL 6617650, at *7 (N.D. Ohio Nov. 21, 2014) (dismissing the plaintiff's unjust enrichment claim because she "purchased her air conditioning unit from Advanced Heating, Cooling & Electric Ohio, not Defendant"); *accord Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Enterprises, Inc.*, 50 N.E.3d 955, 967 (Ohio Ct. App. 4th Dist. 2015) (affirming dismissal of unjust enrichment claim where the plaintiff purchased a grinder from a third party, not directly from the defendant manufacturer, and rejecting the plaintiff's argument that its purchase of the grinder for a "large sum of money" benefitted the defendant); *Bower v. Int'l Business Machines, Inc.*, 495 F. Supp.

2d 837, 844 (S.D. Ohio 2007) ("The Plaintiffs claim that IBM has benefitted from their purchase of the Deskstars (Doc. # 1 at ¶ 72), but nowhere have they alleged that they purchased the Deskstars directly from IBM.  Absent such an allegation, their Complaint is fatally indefinite.").

Here, neither Plaintiff has alleged that they purchased their vehicle directly from GM.  Rather, both Plaintiffs admit that they purchased their respective vehicles from dealers in Ohio.  (Doc. No. 1 at ¶¶ 26, 34.)  Accordingly, under Ohio law, Plaintiffs' allegations are insufficient to establish that they conferred a benefit on GM.  Plaintiffs rely on *U.S. ex rel Klump v. Dynamics Corp.*, No. C–1–95–1016, 1998 WL 34194886 (S.D. Ohio Nov. 17, 1998) to argue that Ohio law does not require a benefit to be conferred directly in order to support a claim for unjust enrichment.  (Doc. No. 15 at 20.)  However, that case was decided before the Ohio Supreme Court's decision in *Microsoft* and involved different factual circumstances, as the case involved a subcontractor relationship, not the indirect purchase of a manufacturer's goods.  *See Clark v. Pizza Baker, Inc.*, No. 2:18-cv-157, 2020 WL 5760445, at *2 (S.D. Ohio Sept. 28, 2020) ("[T]he requirement that there be an economic transaction between plaintiff and the defendant is limited to situations where plaintiff is an indirect purchaser of defendant's good.") (citation omitted).  Therefore, GM's Motion to Dismiss is granted with respect to Plaintiffs' unjust enrichment claims.

## IV.  Conclusion

For the reasons set forth above, GM's Motion to Dismiss (Doc. Nos. 10, 11) is GRANTED IN PART and DENIED IN PART, as follows.  GM's Motion to Dismiss is granted as to Jennings' class action allegations under the OCSPA in Count 1, Airko's breach of express warranty claim in Count 2, Airko's breach of implied warranty in tort claim in Count 3, Plaintiffs' fraudulent omission

claims in Count 4, and Plaintiffs' unjust enrichment claims in Count 5.  The Motion is denied in all other respects.

In sum, in accordance with the above, all claims by Airko are dismissed, and the following claims remain: (1) Jennings' individual claim under the OCSPA in Count 1; (2) Jennings' breach of express warranty claim in Count 2; and (3) Jennings' breach of implied warranty in tort claim in Count 3.

**IT IS SO ORDERED.**


        *s/Pamela A. Barker*
        PAMELA A. BARKER
Date:  July 7, 2021        U. S. DISTRICT JUDGE